**ARCHER–DANIELS–MIDLAND COMPANY and ADM Latin America, Inc., Plaintiffs,**

v.

**Regis PAILLARDON, Defendant.**

**Case No. 12–CV–2227.**

United States District Court,
C.D. Illinois,
Urbana Division.

May 3, 2013.

Jon R. Fetterolf, Ryan Patrick McCarthy, Williams & Connolly, Washington, DC, Jerrold H. Stocks, Featherstun Gaumer Postlewait Stocks Flynn & Hubbard, Decatur, IL, for Plaintiffs.

Anthony B. Ullman, Salans FMC SNR Denton Europe LLP, New York, NY, Andrew W.B. Bequette, Beckett & Webber PC, Urbana, IL, for Defendant.

## OPINION

MICHAEL P. McCUSKEY, District Judge.

This case is before the court for ruling on the Petition to Vacate Arbitration

Award (# 1) filed by Plaintiffs, Archer–Daniels–Midland Company and ADM Latin America, Inc.[1], and related Motions. This court has carefully reviewed the arguments of the parties and the lengthy exhibits provided by the parties. Following this careful and thorough review, this court rules as follows: (1) Plaintiffs' Motion to File Oversize Reply Brief (# 18) is GRANTED; (2) Plaintiffs' Motion for Hearing (# 19) is DENIED; (3) the Motion to Cite Newly–Issued Authority (# 22) filed by Defendant Regis Paillardon is GRANTED; and (4) ADM's Petition to Vacate Arbitration Award (# 1) is DENIED.

## FACTS [2]

ADM, a Delaware corporation headquartered in Decatur, Illinois, is one of the largest agricultural processors in the world. In the late 1990s, ADM began exploring opportunities to expand its business to Latin America. Two contracts were negotiated in late 1998 and early 1999 in order to expand ADM's business into Venezuela. The Joint Venture Agreement (JVA) established a joint venture, the object of which was to sell ADM commodities in Venezuela, and established a new entity, called ADM de Venezuela, C.A. (ADMV), to perform marketing functions in Venezuela. The JVA provided that ADMV was a "corporate joint venture" formed to engage in the "Business" which was defined as "the merchandising of certain mutually agreed upon commodities and products in Venezuela." Originally, Dr. Jorge Fernandez and his wife Elizabeth Fernandez held half of the shares of ADMV and ADM held the other half of the shares. ADM subsequently transferred its interest in ADMV to ADM Latin, a wholly owned subsidiary of ADM. The JVA expressly stated that the business would be conducted by ADM Latin on a "nonexclusive" basis, and no provision of the agreement created an obligation on the part of ADM Latin to sell ADM commodities and products to Venezuelan customers with the assistance of ADMV. ADMV itself did not make any sales; it merely facilitated the sales of ADM Latin.

The second agreement, the Commission Agreement (CA), governed the distribution of profits generated by sales ADM Latin made to Venezuelan customers with the assistance of ADMV. Under the CA, ADM Latin agreed to pay the Fernandez parties 50% of the profits of ADM Latin arising from the conduct of the business. ADM Latin sent commission payments directly to the Fernandez parties and not to ADMV.

Both written agreements contained merger clauses which stated that they set forth the entire agreement and understanding between the parties. The JVA contained an arbitration provision, which stated that "[a]ny dispute arising out of this Agreement shall be settled by binding arbitration conducted by a single arbitrator in accordance with the Commercial Rules of the American Arbitration Association." The JVA stated that the place of arbitration would be Miami, Florida, that the arbitration would be conducted in English and that the Arbitrator would apply

1. The parties have, for the most part, referred to Plaintiffs as "ADM." This court will do the same except where it is necessary to differentiate between ADM and ADM Latin.

2. The facts are based on the Statement of the Facts included in Plaintiffs' Memorandum in Support of Petition to Vacate Arbitration Award (# 16), the Statement of Facts included in Defendant's Memorandum of Law in Opposition (# 12) and the documents provided by the parties. This court has not included any Statements of Fact made by the parties which are not supported by citations to the record.

"the law that a Venezuelan court would apply." The JVA also stated that the agreement "shall continue in force indefinitely unless terminated earlier as provided in Section 7," which allowed ADMV shareholders to terminate the JVA "at any time by a writing signed by each of them." The CA provided that it would remain in effect so long as the JVA remained in effect and also stated that it would be governed by and interpreted in accordance with the law of the State of Delaware.

In May 1999, Regis Paillardon, a citizen of France who had connections in the Venezuelan market, purchased the interest of Elizabeth Fernandez in ADMV and acquired a 10% stake in ADMV. Paillardon was the General Manager of ADMV and the Director of Operations in Venezuela of ADM International, Ltd. In his role with ADM International, Ltd., Paillardon served as a day-to-day contact with ADM Latin regarding sales to Venezuela and managed the administrative details of ADM Latin's Venezuelan transactions. Because of this position, Paillardon did not collect any profits for his 10% share. From 1999 to 2005, ADM paid commissions to the Fernandez parties as agreed under the CA.

In 2005, Dr. Fernandez decided to leave the business and Paillardon then purchased his shares in ADMV. Paillardon became ADM Latin's sole joint partner and succeeded to Dr. Fernandez's rights under the CA. At that time, Paillardon held a 50% interest in ADMV and resigned his position with ADM International, Ltd. Paillardon then began receiving his share of the profits of the joint venture. In November 2007, Paillardon sold 20% of his 50% interest to Olivier Terrase. After that date, Paillardon was entitled to 40% of the profits and Terrase was entitled to 10% of the profits.[3] The joint venture was

highly successful and, over its lifespan, made gross sales in excess of $1 billion. During the four years in which Paillardon was entitled to a share of the profits as a partner in the joint venture, his share of the profits was in excess of $21 million. Fiscal year 2009 (which apparently ran from July 1, 2008, to June 30, 2009) was the joint venture's most profitable year, resulting in profits paid and owed to Paillardon exceeding $8 million.

In 2009, ADM began raising questions about the joint venture's arrangements for paying commissions to brokers that were used by customers, even though, according to Paillardon, those same arrangements had been employed from the time the joint venture started. ADM accordingly undertook a "due diligence" investigation on the brokers. In April 2009, ADM instructed its ADM Latin employees that no further third party "commission" payments would be approved pending further review and stopped new sales that were to include brokerage commissions. In May 2009, ADM froze all activities of the joint venture. In June 2009, while the due diligence was still ongoing, ADM made the unilateral decision to terminate the JVA. This decision followed an in-person meeting at ADM's offices in Decatur, Illinois, in which ADM's senior managers and lawyers directed questions to Paillardon and determined that he did not provide adequate responses. Following the unilateral termination, ADM refused to pay Paillardon the share of the joint venture profits he was still owed for the period from January to June 2009.

Paillardon filed a lawsuit against ADM Latin in the United States District Court for the Central District of Illinois on December 18, 2009, in Case No. 09–CV–2312. ADM Latin filed a Motion to Dismiss,

---

3. Terrase was not a party to the arbitration.

arguing that the action was filed in an improper venue because it was subject to binding arbitration in another judicial district. On May 26, 2010, Paillardon filed a Notice of Voluntary Dismissal. On June 21, 2010, Paillardon filed a demand for arbitration with the American Arbitration Association. The Arbitrator, mutually agreed on by the parties, was Jose Maria Abascal, a Mexican national. On November 19, 2010, Paillardon filed an Amended Statement of Claim and asserted claims for ADM's failure to pay the amounts owed to him under the CA for the second half of fiscal year 2009 and also asserted claims related to the joint venture, including: (1) that ADM Latin violated Section 7 of the JVA by terminating it without written consent; (2) that ADM Latin violated Venezuelan law by failing to act in good faith in carrying out its duties under the JVA; (3) unlawful conditioning of payment due and owing based upon ADM's refusal to pay Paillardon the amounts he was owed for the second half of fiscal year 2009 unless he agreed to certain conditions insisted on by ADM; and (4) unfair competition based upon ADM's competing with the joint venture in the sale of commodities in Venezuela. Paillardon sought both "material" and "moral" damages (as those terms are defined under Venezuelan law) on those claims. In addition, Paillardon sought recovery of his share of the joint venture's bad debt reserve, his costs of the arbitration and pre-award interest. In the arbitration, ADM asserted numerous legal and factual defenses.

The record of the arbitration proceedings is voluminous. The parties submitted pre-hearing briefs, along with 23 fact and witness statements (which served as direct testimony of the respective witnesses), as well as post-hearing submissions and responses to a questionnaire propounded by the Arbitrator, with consent of both sides, concerning certain legal issues. The parties' written submissions in the arbitration were in excess of 500 pages. In addition, the Arbitrator held a two-week long hearing from September 12 to September 23, 2011, during which witnesses were subject to cross-examination. The parties also jointly submitted over 700 exhibits to the Arbitrator.

## ARBITRATION AWARD

On July 9, 2012, the Arbitrator issued his 55–page Final Award. The Arbitrator ruled in favor of Paillardon on some of his claims. In reaching his decision, the Arbitrator thoroughly discussed the terms of the JVA and CA and the parties' dealings with each other. He also thoroughly discussed the applicable Venezuelan law and included a discussion of the opinions of the parties' legal experts. The Arbitrator concluded that the JVA and CA were linked by the actual intent of the parties, which was the implementation of the business. He also concluded that the governing agreement was the JVA and the CA and ADMV were instrumentalities in the implementation of the JVA. The Arbitrator noted that ADM had stated that the CA described how profits relating to ADMV would be allocated and concluded that the CA served as an instrumentality through which ADM Latin paid the local partners, including Paillardon, the agreed share of profits. The Arbitrator concluded that, since the controlling agreement was the JVA, the law applicable to the legal consequences deriving from the linkage was the law of Venezuela. The Arbitrator rejected ADM's defense that the damages claimed by Paillardon arose from the CA and that this agreement did not allow for the rights and remedies that Paillardon sought. The Arbitrator also rejected ADM's defense that the JVA was not enforceable because it had an illegal purpose. The Arbitrator stated that "ADM failed to prove its de-

fenses." The Arbitrator stated that, after considering ADM's defenses, he concluded that ADM was in breach of the JVA. The Arbitrator stated that ADM unilaterally terminated the JVA and breached the provision which allowed ADMV shareholders to terminate the JVA "at any time by a writing signed by each of them." The Arbitrator concluded that ADM was liable for the damages caused to Paillardon. The Arbitrator, however, rejected Paillardon's tort claims and declined to award Paillardon moral damages.

The Arbitrator concluded that ADM owed Paillardon $3,163,085.60 for the unpaid balance of his share of ADM Latin's profits for the fiscal year which ended June 30, 2009. The Arbitrator also concluded that ADM owed Paillardon $388,795.92 for his share of the bad debt reserve. In addition, the Arbitrator concluded that Paillardon's lost profits "should be calculated from the stream of future profits that can reasonably be expected had the JVA not been wrongfully terminated." The Arbitrator accepted Paillardon's expert's calculations, which quantified lost profits to be the value of earnings Paillardon would have received over a period of ten years, which he calculated to be $31 million. The total award was $34,551,881.52, plus interest. The Arbitrator also concluded that ADM was responsible for the costs of the arbitration.

### PROCEDURAL HISTORY

On August 27, 2012, ADM filed a Petition to Vacate Arbitration Award (# 1) in this case. ADM also filed a Motion for Leave to File Excess Pages (# 4) and attached a 31–page Memorandum in Support and an Index of Exhibits. On October 12, 2012, Paillardon filed a Response to ADM's Motion for Leave to File Excess Pages (# 9), a Motion for Leave to File Oversized Brief (# 10), a Response to Mo-

tion to Vacate International Arbitration Award (# 11), a Memorandum in Opposition (# 12) and an Affidavit in Opposition (# 14) with attached exhibits. On October 16, 2012, this court entered a text order and granted ADM's Motion for Leave to File Excess Pages. On October 16, 2012, ADM's Memorandum in Support of Petition to Vacate Arbitration Award (# 16) was filed and, on October 17, 2012, ADM filed its Exhibits in support (# 17).

On October 26, 2012, ADM filed a Motion for Leave to File Oversize Reply Brief (# 18) and a Motion for Hearing (# 19). On November 6, 2012, Paillardon filed his Responses (# 20, # 21). On March 18, 2013, Paillardon filed a Motion to Cite Newly–Issued Authority (# 22). On March 28, 2013, this court entered a text order and stated that ADM's Motion to Vacate Arbitration Award (# 1) is DENIED, with a written Opinion to follow. This Opinion sets out the reasoning behind this court's determination that there is no basis for vacating the arbitration award in this case.

### PROCEDURAL MOTIONS

ADM asked this court to allow it to file an oversize reply brief and attached a 14–page Reply Memorandum in Support of Petition to Vacate Arbitration Award. In his Response to the Motion, Paillardon pointed out that Rule 7.1(B)(3) of the Local Rules of the Central District of Illinois provides that no reply is allowed. Paillardon also argued that no reply was necessary because the issues raised by ADM's motion are not complicated and are easily addressed through application of settled law. Paillardon stated, however, that in the event this court decided to grant ADM leave to file its Reply Brief, Paillardon asked to also be allowed leave to file an oversized reply brief. Paillardon attached a 15–page Sur–Reply Memorandum of

Law in Opposition to Petitioners' Petition to Vacate Arbitral Award.

This court hereby grants ADM's Motion for Leave to File Oversize Reply Brief (# 18). This court has considered ADM's Reply Memorandum and Paillardon's Sur-Reply Memorandum in ruling on ADM's Petition to Vacate Arbitration Award (# 1).

■ ADM has also asked this court to allow oral argument regarding the Petition to Vacate Arbitration Award. ADM pointed out that this case concerns an arbitration award in favor of Paillardon for nearly $35 million. ADM argued that oral argument would be appropriate here because it would allow the parties the best opportunity to adequately present their case, as well as assisting the court by allowing the parties the opportunity to answer any questions the court may have. In his Response, Paillardon asked that the motion be denied because ADM waived the right to request oral argument by not requesting it in its Petition to Vacate Arbitration Award and because the issues raised are not complex and may be disposed of easily under established legal principles. This court concludes that oral argument is not necessary in this case and hereby denies ADM's Motion Requesting Oral Argument (# 19).

Paillardon has asked this court to allow him to cite newly-issued authority in opposition to Petitioner's Petition to Vacate Arbitration Award. ADM has not opposed Paillardon's Motion (# 22) and it is hereby granted.

## MOTION TO VACATE

### 1. STANDARD

ADM has argued that this court should vacate the Arbitrator's award for failing to meet the standards set out in the New York Convention and because it fails to meet the standards found in the Federal Arbitration Act (FAA). ADM insists that the award should be vacated because: (1) the Arbitrator exceeded his authority by ignoring the parties' express rights and obligations under the JVA; (2) the award contravenes the law and public policy of both Venezuela and the United States by condoning unlawful behavior; and (3) the Arbitrator wholly failed to address two critical ADM defenses.

Chapter 1 of the FAA codifies the original Federal Arbitration Act of 1925; it applies to all domestic awards and to all other awards not covered by another legal instrument. *Johnson Controls, Inc. v. Edman Controls, Inc.*, 712 F.3d 1021, 1024–25 (7th Cir.2013). The FAA also includes Chapter 2 which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, commonly called the New York Convention. *Johnson Controls, Inc.*, 712 F.3d at 1024–25, *citing* 9 U.S.C. § 201. Chapter 3 implements the Inter–American Convention on International Commercial Arbitration of January 30, 1975, known as the Panama Convention. *Johnson Controls, Inc.*, 712 F.3d at 1024–25. Venezuela is a signatory to the New York Convention and it is undisputed that the New York Convention applies in this case.

Chapter 2 of the FAA states that a Convention award may be vacated only on the grounds specified in the New York Convention. *Johnson Controls, Inc.*, 712 F.3d at 1025–26, *citing* 9 U.S.C. § 202. The Seventh Circuit recently stated that "[t]his could be important in some cases, because the Convention grounds for vacatur are slightly different from those in Chapter 1 of the FAA." *Johnson Controls, Inc.*, 712 F.3d at 1025–26. As ADM has recognized, arbitration awards under the New York Convention may be vacated if one of the following grounds exists: (1) the

parties to the agreement were under some incapacity, or the agreement is not valid under the law chosen by the parties or, if no law is chosen, the law of the country where the award was made; (2) the party against whom the award is invoked was not given proper notice or was unable to present his case; (3) the award falls outside the scope of the submission to arbitration; (4) the composition of the arbitral authority or procedure was not in accordance with the parties' agreement or the law of the country where the arbitration occurred; or (5) the award is not yet binding or has been set aside by a competent authority. New York Convention, Art. V. In addition, recognition and enforcement of an arbitral award may also be refused if the competent authorities in the country where recognition and enforcement is sought finds that: (1) the subject matter of the difference is not capable of settlement by arbitration under the law of that country; or (2) recognition or enforcement of the award would be contrary to the public policy of that country. New York Convention, Art. V. The FAA provides that an arbitration award may be vacated if: (1) the award was procured by corruption, fraud or undue means; (2) there was evident partiality or corruption in the arbitrators; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced; or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a).

Paillardon has argued that the New York Convention applies in this case and that grounds for vacating an arbitration award available under the FAA but not

identified in the Convention cannot be relied on to vacate a Convention award. The Seventh Circuit has recognized that it is not clear whether a party may bring an action under Chapter 1 of the FAA to vacate an award issued in a U.S. jurisdiction, but governed by the New York Convention. *See Johnson Controls, Inc.,* 712 F.3d at 1025–26.

■■■■ In any case, "[a]ttempts to obtain judicial review of an arbitrator's decision undermine the integrity of the arbitral process." *Johnson Controls, Inc.,* 712 F.3d at 1028–29. Therefore, the "grounds for overturning an arbitration award are extremely limited." *Halim v. Great Gatsby's Auction Gallery, Inc.,* 516 F.3d 557, 563 (7th Cir.2008). Where the parties have bargained for the arbitrator's construction of their agreement, "courts will set aside the arbitrator's interpretation of what their agreement means only in rare instances." *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17,* 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000). Courts uphold an arbitration award so long as "an arbitrator is even *arguably* construing or applying the contract and acting within the scope of this authority." *Johnson Controls, Inc.,* 712 F.3d at 1025–26 (emphasis in original), *quoting Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.,* 495 F.3d 779, 782–83 (7th Cir.2007). An award should not be overturned because an arbitrator "committed serious error" or the decision is "incorrect or even whacky." *Johnson Controls, Inc.,* 712 F.3d at 1025–26, *quoting Local 15, Int'l Bhd. of Elec. Workers,* 495 F.3d at 782–83. "A reviewing court will enforce the arbitrator's award so long as it 'draws its essence from the contract,' even if the court believes that the arbitrator misconstrued its provisions." *United Food & Commercial Workers, Local 1546 v. Ill. Am. Water Co.,* 569 F.3d 750, 754 (7th

Cir.2009), *quoting United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). "An arbitrator's decision draws its essence from the contract if it is based on the arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be." *United Food,* 569 F.3d at 754. Further, arbitrators do not exceed their authority by failing "to discuss every issue that the parties contested." *See Affymax, Inc. v. Ortho–McNeil– Janssen Pharms., Inc.,* 660 F.3d 281, 285 (7th Cir.2011); *see also Halim,* 516 F.3d at 564 (an arbitrator does not exceed his power "by not explaining his award in greater detail").

 In addition, although the New York Convention and the FAA recognize a public policy exception to enforcement of an arbitration award, an award will not be vacated on these grounds unless enforcement of the award would violate public policy. *See E. Associated Coal Corp.,* 531 U.S. at 62–63, 121 S.Ct. 462; *George Watts & Son, Inc. v. Tiffany & Co.,* 248 F.3d 577, 581 (7th Cir.2001). Importantly, the United States Supreme Court has made it clear that "any such public policy must be 'explicit,' 'well defined,' and 'dominant.'" *E. Associated Coal Corp.,* 531 U.S. at 62, 121 S.Ct. 462, *quoting W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). It must be "ascertained by reference to positive law and not from general considerations of supposed public interests." *E. Associated Coal Corp.,* 531 U.S. at 63, 121 S.Ct. 462; *see also Local 15, Int'l Bhd. of Elec. Workers,* 495 F.3d at 784. Moreover, even when a public policy violation has been asserted, the arbitrator's resolution of this issue is conclusive as to the parties to the arbitration. *See Baxter Int'l, Inc. v. Abbott Labs.,* 315 F.3d 829, 832 (7th Cir. 2003).

## 2. ADM'S ARGUMENTS

 ADM first insists that the Arbitrator exceeded his authority when he concluded that ADM breached the JVA and was liable for damages to Paillardon. ADM argues that, because the JVA stated that sales through the joint venture would be made on a "nonexclusive" basis and the Arbitrator found that ADM Latin had "unfettered discretion" regarding whether sales would be made through the joint venture, there is absolutely no basis for awarding damages for breach of the JVA. ADM takes issue with the Arbitrator's conclusion that "ADM breached the JVA by unilaterally terminating it and stopping the performance of the Business." ADM has argued, stridently, that it could not have breached the JVA by stopping the performance of the Business because the JVA did not require it to make sales through the joint venture. ADM also argues that, for the same reason, its unilateral termination of the JVA could not possibly have caused a $31 million loss to Paillardon. ADM asserts that the Arbitrator's award is not based on the contract but rather the Arbitrator's "own sense of equity," citing *Arch of Ill. v. Dist. 12, United Mine Workers of Am.,* 85 F.3d 1289, 1292 (7th Cir.1996).

This court first notes that, because this was an international arbitration to which the New York Convention applies, there is a legitimate question regarding whether exceeding authority is even a proper basis for vacating the Arbitrator's award. However, like the court in *Johnson Controls, Inc.,* this court concludes that it does not need to decide this issue because it is clear that ADM has not shown that the Arbitrator exceeded his authority. *See Johnson Controls, Inc.,* 712 F.3d at 1025–26.

 Before a court can reject an award because of language in an arbitra-

tor's opinion, the opinion must "unambiguously reflect that the arbitrator based his decision on noncontractual grounds." *Arch of Ill.*, 85 F.3d at 1293. In this case, the Arbitrator discussed the contract at issue and reached a conclusion that ADM breached the JVA by unilaterally terminating it and owed damages to Paillardon. This court concludes that there is no basis for concluding that the Arbitrator exceeded his authority in issuing his award. After hearing all the evidence, the Arbitrator accepted the damages calculations presented by Paillardon, which assumed that, if the unilateral termination had not taken place, ADM would have continued to do business through the joint venture. The Arbitrator expressly found that there was no support for ADM's contention that, if the unilateral termination had not taken place, it would have stopped all transactions involving brokers. The Arbitrator found that "ADM was prepared to continue transactions with brokers" after the due diligence had been completed and written contracts signed. This court agrees with Paillardon that there is no inconsistency between a determination that ADM had discretion to stop performing and a determination that such discretion would not have been exercised if the JVA had not been unilaterally terminated.

ADM obviously strongly disagrees with the award, but agreed to binding arbitration in the JVA. This court, like the court *Arch of Ill.*, a case relied upon by ADM, "cannot say with certainty that the arbitrator's own words demonstrate that he failed to interpret the [JVA]." *See Arch of Ill.*, 85 F.3d at 1293. Another case relied upon by ADM stated that "[i]t is only when the arbitrator *must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract ... that the award can be said not to draw its essence from the [parties' agreement]." *United Food*, 569 F.3d at 755, *quoting*

*Ethyl Corp. v. United Steelworkers of Am. AFL–CIO–CLC*, 768 F.2d 180, 184–85 (1985) (emphasis in original). This court concludes that, based upon this standard, ADM has not shown that the Arbitrator's award did not draw its essence from the JVA. As in *United Food*, the award must stand because the Arbitrator "interpreted the agreement" and "reached a conclusion," thereby providing "exactly what the parties bargained for." *See United Food*, 569 F.3d at 755. In addition, Paillardon is correct that it "was for the arbitrator to decide who breached the agreement" and "what damages were recoverable as a consequence." *See Flexible Mfg. Sys. Pty., Ltd. v. Super Prods. Corp.*, 86 F.3d 96, 100 (7th Cir.1996). Once the Arbitrator did so, "that was the end of it." *See Flexible Mfg. Sys.*, 86 F.3d at 100.

This court also agrees with Paillardon that ADM's argument that the Arbitrator exceeded his authority by failing to address two defenses raised by ADM is without merit. The Arbitrator acknowledged ADM's "mercantile mandate" defense and stated that "ADM failed to prove its defenses." The Arbitrator also rejected ADM's argument that Delaware rather than Venezuelan law applied, thereby eliminating ADM's purported mitigation defense. The fact that ADM would have liked a more comprehensive discussion of its defenses is not a basis for vacating the award. *See Affymax, Inc.*, 660 F.3d at 285; *Halim*, 516 F.3d at 564

As the Seventh Circuit stated in a case relied upon heavily by ADM:

> When parties agree to arbitrate their disputes they opt out of the court system, and when one of them challenges the resulting arbitration award he perforce does so not on the ground that the arbitrators made a mistake but that they violated the agreement to arbitrate, as

by corruption, evident partiality, exceeding their powers, etc.—conduct to which the parties did not consent when they included an arbitration clause in their contract. *Wise v. Wachovia Sec., Inc.,* 450 F.3d 265, 269 (7th Cir.2006). Therefore, in the typical case involving the interpretation of a contract, "the issue for the court is not whether the contract interpretation is incorrect or even wacky but whether the arbitrators had failed to interpret the contract at all ... for only then were they exceeding the authority granted to them by the contract's arbitration clause." *Wise,* 450 F.3d at 269 (citations omitted). The court in *Wise* stated that, if the plaintiffs in that case had presented overwhelming evidence in support of their position and the defendant responded with a bare denial, a court may infer that, in entering an award in favor of the defendant, the arbitrators had "a corrupt motive or at least that they had exceeded the powers granted to them by the arbitration clause." *Wise,* 450 F.3d at 269. The court determined that was not the situation before it and affirmed the district court's decision to confirm the arbitrators' award. *Wise,* 450 F.3d at 270.

This court concludes that *Wise* supports Paillardon's position rather than ADM's. This is not a situation where ADM presented overwhelming evidence in support of its position and Paillardon responded with a bare denial. Both sides presented voluminous evidence and, based upon the evidence presented, the Arbitrator determined that Paillardon was entitled to damages for breach of contract. Based upon the case law regarding the limited scope of court review of an arbitration award, including the decision in *Wise,* this court finds no basis for vacating the award in this case.

██ This court also agrees with Paillardon that ADM's arguments that en-

forcement of the award would violate public policy are baseless. This court agrees with Paillardon that, during the arbitration, ADM's witnesses conceded that ADM found no evidence of improper payments to brokers. Therefore, at the arbitration, ADM argued that the JVA was null and void because Paillardon's conduct rendered its *causa* illicit due to his violation of exchange-control and criminal laws of Venezuela. This court agrees with Paillardon that this argument was first made during the arbitration proceedings, long after the termination of the JVA.

ADM's argument was based upon a change in Venezuelan law in 2003. From the time the JVA was in effect, ADM Latin required its Venezuelan customers to pay in U.S. dollars, it would not accept Venezuelan bolivares. From 1999 to 2003, the customers could simply exchange their bolivares for dollars through the private market. However, in 2003, Venezuela enacted currency exchange control regulations and established a government agency, the Commission for the Administration of Currency Exchange (known as CADIVI), to administer the country's currency exchange system. CADIVI closely rationed U.S. dollars, but it offered an extremely preferential exchange rate to importers of certain products, including food commodities. Obtaining U.S. dollars from CADIVI at this preferential rate could cost half as much as obtaining U.S. dollars on the black market. Due to this preferential exchange rate, after 2003, ADM Latin's Venezuelan customers almost exclusively used CADIVI to pay for their purchases. In order to exchange bolivares for U.S. dollars through CADIVI, customers were required to submit a number of different documents, including invoices listing that sales price and other particulars of the transaction, including any commission. Once CADIVI authorized the ex-

change, the customer's bolivares would be converted to U.S. dollars, which would then be paid to ADM's U.S. bank account. ADM presented evidence that some of these transactions included the commission for the customer's broker in the purchase price, which would allow the customer to receive the CADIVI preferential exchange rate for food sales on the inflated amount, which it would then pay to ADM Latin. ADM Latin would keep only the actual purchase price and route the commission amount to the broker when it received an invoice identifying the customer's broker. By April 2009, Paillardon used this third party payment arrangement in sales accounting for over half of ADM Latin's Venezuela profits. CADIVI Administrative Ruling No. 085 set forth the requirements for documentation to be submitted by importers (the Venezuelan customers). This regulation stated that the price and commissions should be separately set forth in the documentation submitted to CADIVI for review.

ADM presented evidence from an expert on Venezuelan law, Pedro Luis Planchart–Pocaterra (Planchart), that the JVA became illicit because Paillardon agreed to build monies to be paid to customer brokers into the sales price of the commodity or freight and then directed representatives of ADMV to create local invoices that did not specifically reference the customer's broker fee. Planchart concluded that this violated Venezuelan law, namely, the criminal provisions of the Law Against Illegal Foreign Exchange Transactions.

In response, Paillardon pointed out that the preparation of customer invoices that included the commissions of brokers that the customer later submitted to CADIVI was not secretly made by Paillardon; instead, ADM had knowledge of it. Paillardon noted that ADM was fully aware each time that the commission of the brokers

was added to the price charged to the customers as the commission was explicitly documented in the trade slips that were approved by ADM each time a sale involving brokers was made. Additionally, in the sales transactions involving brokers, ADM took on the contractual responsibility for paying the brokers. Paillardon pointed out that, on April 22, 2009, ADM's controller wrote that "it was a long-standing practice for ADM to prepare such invoices, that it was known that invoices were being submitted to CADIVI, and that **ADM's legal and accounting departments had looked at the practice and concluded it was legal.**" (Emphasis in Arbitrator's Final Award.)

The Arbitrator carefully and thoroughly considered ADM's argument and found the claim unwarranted. The Arbitrator noted that Planchart did not provide supporting Venezuelan authorities for his opinion. The Arbitrator concluded that a supervening illicit *causa* did not make the JVA null and void. The Arbitrator stated that it was his opinion that the sales involving brokers and CADIVI did not violate the criminal law of Venezuela and, even if they did, the JVA was not illicit. The Arbitrator further concluded that ADM did not demonstrate that the invoices including the brokers' commissions violated the CADIVI regulations and specifically stated that "CADIVI regulations were not violated." The Arbitrator stated that the acknowledged practice of factoring the brokers' commission in the invoice was legal and bound ADM Latin to pay the brokers, as agreed.

This court also notes that Paillardon presented evidence to the Arbitrator that Ruling 085 was repealed in a new ruling on September 23, 2011. Paillardon has persuasively argued that the regulation could not represent a "well defined" and "dominant" public policy of Venezuela since it

has been repealed. Based upon the applicable case law, this court has no trouble concluding that ADM has not shown that enforcement of the Arbitrator's award would violate public policy. The Arbitrator's determination that there was no violation of law is conclusive on the parties to the arbitration. *See Baxter Int'l, Inc.*, 315 F.3d at 832. This court therefore agrees with Paillardon that the award does not require either ADM or Paillardon to take any actions that violate any rule of positive law, or even in any way assist in the commission of an illegality.

Finally, ADM has thrown in a brief argument that the Arbitrator decided this case due to an "evident partiality." This court concludes that this argument is completely baseless and requires no further discussion.

IT IS THEREFORE ORDERED THAT:

(1) ADM's Motion to File Oversize Reply Brief (# 18) is GRANTED.

(2) ADM's Motion for Hearing (# 19) is DENIED.

(3) Paillardon's Motion to Cite Newly–Issued Authority (# 22) is GRANTED.

(4) ADM's Petition to Vacate Arbitration Award (# 1) is DENIED.

(5) This case is terminated.